## LANDIG SERVICE INSURANCE COMPANY, Appellant,

v.

## Henry WILLIAMS, Jr., Appellee.

### No. 3646.

Court of Civil Appeals of Texas.

Waco.

May 7, 1959.

C. C. Jopling, La Grange, for appellant.

John A. Hancher, Columbus, for appellee.

TIREY, Justice.

This cause involves the question of whether the double indemnity clause of the policy is applicable to an undisputed factual situation. The parties stipulated as follows:

"It is agreed by and between Appellant and Appellee that the following stipulations shall constitute the statement of facts upon the appeal of this case, to-wit:

"It is agreed by the defendant, Landig Service Insurance Company, that it is liable upon the policy sued upon in accordance with the terms for the natural death of the insured to the extent of $450.00, the original policy being attached hereto and being a part of these stipulations the same as if copied herein verbatim; however, it is specifically denied by the defendant insurance company that it is liable in any manner for a double indemnity on the policy in accordance with its tenor, effect and reading. It is agreed that the defendant paid Penn Funeral Home the sum of $300 under said policy which inured to the benefit of Henry Williams, Jr., the beneficiary under said policy, and tendered into court the sum of $150.00, completing the payment of $450.00, being the amount due under said policy as contended by the defendant for the natural death of Cora Williams.

"That Cora Williams is dead, and that she died on or about May 4, 1957.

"That Cora Williams died from insulin shock as a result of receiving an overdose of insulin.

"That on March 30, 1957, Cora Williams was admitted as a patient to Laughlin Hospital in Eagle Lake, Texas, and on or about April 1st or 2nd Dr. J. C. Laughlin diagnosed her condition as a diabetic and prescribed certain insulin shots to be administered to her by hypodermic injection.

"That Cora Williams was released from the hospital on or about April 3, 1957, at which time Dr. Laughlin instructed Eula Ashton on how to administer the insulin shots. The said Eula Ashton was a neighbor of Cora Williams. Dr. Laughlin furnished the said Eula Ashton with a hypodermic syringe which was calibrated properly on opposite sides by units or dosage. On one side of said syringe the calibrations were marked ten, twenty, thirty, forty and fifty, and on the other side said syringe was calibrated in units of twenty, forty, sixty and eighty, such two scales being used for insulin of different strength or potency. At the time of furnishing said syringe to Eula Ashton, Dr. Laughlin also furnished her with a bottle containing insulin which was in the strength proper for administration of forty-unit shots. Said bottle was not full but contained enough for three or four shots. Eula Ashton was instructed by Dr. Laughlin to withdraw from the bottle of insulin into the syringe sufficient insulin for a forty-unit shot as indicated on the forty-unit scale of the syringe. Approximately a week later said forty-unit bottle of insulin was about used up, and Dr. Laughlin examined Cora Williams and decided that in her treatment the insulin shots should be increased to fifty units per shot. He therefore furnished Eula Ashton with two bottles of insulin which was twice the strength or potency of the first bottle, and instructed her to withdraw from the bottle fifty units of such double-strength insulin and he instructed her to use the eighty-unit scale on the syringe. Cora Williams received approximately nineteen shots of the double strength insulin, which was an overdose of approximately forty units per shot. In administering the shots Eula Ashton did not understand the calibrations or scale on the syringe and administered a double dose on each shot throughout the approximately nineteen-day period immediately prior to Cora's death. This happened by Eula Ashton withdrawing the plunger in the syringe to the fifty-unit mark on the forty-unit scale, rather than to the fifty-unit mark on the eighty-unit scale.

"It is agreed that by reason of the excessive amount of insulin received by Cora Williams in the nineteen doses resulted in insulin shock and that Cora Williams died as a result thereof.

"It is agreed that the only matter in controversy is whether or not the defendant is liable for double indemnity under the terms and provisions of the policy, and no other question is raised and no other question is to be raised on this appeal."

In the Judgment we find this recital: "* * * the Court is of the opinion and finds that Defendant Landig Service Insurance Company is liable to Plaintiff under the double indemnity provisions of the policy sued on herein," and decreed accordingly.

We quote pertinent provisions of the policy in suit:

"In Consideration of the payment in advance of the premium mentioned below, and the payment of a like amount at each monthly period thereafter, the Landig Service Insurance Company (hereinafter called Company) issues this policy, which entitles the beneficiary, whose name is set opposite the member's name, to receive upon such member's death the amount set opposite such member's name in the following schedule, and subject to the con-

ditions printed hereon, said Company here now promises to pay to such beneficiary upon receipt at its office of due and satisfactory proofs of death of such member, the sum of money set opposite the name of the member so dying, in accordance with the following schedule:

" * * * Benefit payable for accidental death is double the amount payable for natural death.

" * * * The benefits for Accidental Death shall be subject to the same restrictions as the Benefit for Natural Death, and shall be paid by the Company only upon receipt of due proof that the death of the Insured named herein occurred as a result, directly and independently of all other causes, of bodily injury effected solely through external, violent and accidental means evidenced by a visible contusion or wound (except in the case of drowning or internal injuries revealed by autopsy), provided that such death occurred within ninety days after such injury was sustained, while the policy is in full force, and was not caused directly or indirectly by bodily or mental infirmity or disease in any form, other than pyogenic infection occurring simultaneously with or in consequence of an accidental cut or wound."

Appellee went to trial on his First Amended Original Petition, and his First Amended Supplemental Petition. Pertinent to the sole point here before us, plaintiff, in his First Amended Original Petition alleged:

"On or about the 4th day of May, 1957, the said Cora Williams suffered insulin shock as a result of receiving an over-dose of insulin, which caused her death on or about the 4th day of May, 1957. Such over-dose of insulin was administered to the said Cora Williams by mistake and accident, and resulted in her death, and her death was accidental. Said injury was totally unforeseen, unexpected, unusual, undesigned and accidental."

Appellant's Point 1 is: "The Court erred in holding that, under the stipulations, Cora Williams's death occurred as a result, directly and independently of all other causes, of bodily injury effected solely through external, violent and accidental means evidenced by a visible contusion or wound."

Much has been written by our Appellate Courts on this exact question. We think that one of the most comprehensive opinions is by the Dallas Court in Hanna v. Rio Grande National Life Insurance Company, Tex.Civ.App., 181 S.W.2d 908, 911. Opinion dated June 16, 1944. (W.R.). In this opinion Justice Young reviews at some length the leading decisions by our Supreme Court and other Appellate Courts applicable to similar factual situations. In this opinion we find this statement of the rule:

"Furthermore, plaintiff has pled an overdose of the medicine by mistake, resulting fatally. Such state of facts has been uniformly held to involve liability under a contract providing against death or injury through external, violent and accidental means." Citing many cases.

■ Since our Supreme Court gave a straight out refusal to the Application for Writ of Error in the foregoing cause, the opinion of the Dallas Court became an authority (substantially), of equal dignity as an opinion of our Supreme Court.

■ Our Supreme Court has not seen fit to change or modify the rule here stated. Our view is that under the pleadings and stipulations of the parties, and the foregoing decisions, the Trial Court did not err in holding that the death of the insured was an accidental death within the double indemnity provisions of the life insurance policy here sued upon.

Since we are bound by the rule in Texas it is our duty to affirm the Judgment of the Trial Court, and it is accordingly affirmed.

Appellee has filed a rather comprehensive brief showing the rule in other juris-

**600**

dictions that support the Texas Rule, and we have decided to list these citations: Hawkins v. New York Life Ins. Co., 1954, 176 Kan. 24, 269 P.2d 389. Mansbacher v. Prudential Ins. Co., 1937, 273 N.Y. 140, 7 N.E.2d 18, 111 A.L.R. 618. Metropolitan Life Ins. Co. v. Funderburk, 1935, Tex.Civ. App., 81 S.W.2d 132, Error Dism. Spence v. Equitable Life Assur. Soc., 1937, 146 Kan. 216, 69 P.2d 713. Townsend v. Commercial Travelers' Mut. Accident Ass'n, 231 N.Y. 148, 131 N.E. 871, 17 A.L.R. 1001. United States Mut. Acc. Ass'n v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60; American Jurisprudence, vol. 29, p. 741, Sec. 987, p. 715, Sec. 942. American Law Reports, 2d Vol. 52, pp. 1086–1093, Secs. 3 and 4. Cooley's Briefs on Insurance, 2d Ed., Vol. 6, page 5234. Corpus Juris, Vol. 1, p. 450, Sec. 123, P. 487, Sec. 225; 45 C.J.S. Insurance § 775. Ruling Case Law, Vol. 14, p. 1256. Texas Jurisprudence, Vol. 24–B, p. 563.